**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DAWN M. in her individual capacity and as Parent and Natural Guardian of N.M., | |
| *Plaintiff*, | Civil Action No. 20-10165 |
| v. | **OPINION** |
| SCHOOL DISTRICT OF THE CHATHAMS, | |
| *Defendant*. | |

**John Michael Vazquez, U.S.D.J.**

This matter arises under the Individual with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 *et seq*. Plaintiff, on behalf of her daughter N.M., moves for summary judgment on the administrative record. D.E. 24. Plaintiff contends that the Administrative Law Judge ("ALJ") erred in finding that N.M. is not eligible for special education under the IDEA and that the School District of the Chathams (the "District" or Defendant) provided N.M. a free appropriate public education ("FAPE"). *Id.* Plaintiff seeks a reversal the ALJ's decision, an IEP for N.M., and compensatory education for N.M.. *Id.* Defendant opposed Plaintiff's summary judgment motion, D.E. 22, and Plaintiff filed a reply, D.E. 39.

Also before the Court is Defendant's motion to supplement the administrative record, D.E. 38; Plaintiff's opposition to the motion, D.E. 40; and Plaintiff's motion to strike, D.E. 42. The

Court reviewed the parties' submissions[1] and the administrative record[2] and decided the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).  For the reasons set forth below, Plaintiff's motion for summary judgment is **DENIED**.  Defendant's motion to supplement the administrative record and Plaintiff's motion to strike are also **DENIED**.

The parties also submitted letters regarding Plaintiff's submission of a complete copy of the administrative record.  D.E. 48, D.E. 49.  The Court received a copy of the administrative record from the New Jersey Department of Education.  Thus, the Court does not reach issue raised in Defendant's letter, D.E. 48.

## I.      BACKGROUND[3]

### A. N.M.'s Educational History

N.M. is a student in the District.  SOMF ¶ 1.  In July 2016, N.M. was found eligible for special education and related services under the classification of a "specific learning disability"

---

[1] Plaintiff's brief in support of her summary judgment motion, D.E. 24-1 ("S.J. Br."); Defendant's brief in opposition to Plaintiff's summary judgment brief, D.E. 22 ("S.J. Opp."); Plaintiff's reply brief, D.E. 39; Defendant's motion to supplement the administrative record, D.E. 38; Plaintiff's opposition to Defendant's motion to supplement the administrative record, D.E. 40; and Plaintiff's motion to strike, D.E. 42.

Although Defendant's brief, D.E. 22, was submitted *before* Plaintiff's brief, Defendant indicates that the brief is its opposition brief to Plaintiff's motion for summary judgment, D.E. 41. Accordingly, the Court considers it as such.

[2] The record consists of the July 21, 2020 final decision and order of Administrative Law Judge Susana E. Guerrero ("ALJ Op.") and the joint record of exhibits from the administrative proceeding (J1-J1635).

[3] The factual background is taken from Plaintiff's Statement of Material Facts ("SOMF"), the ALJ Op., and the joint record.  Pursuant to Local Rule 56.1, the opponent of a summary judgment motion must furnish, with its opposition papers, a responsive statement of material facts addressing each paragraph of the movant's statement; any material fact not disputed will be deemed undisputed for purposes of the summary judgment motion.  Defendant failed to submit a responsive statement of material facts to Plaintiff's SOMF.  Accordingly, Plaintiff's material facts will be deemed admitted for Defendant's failure to respond.  However, to the extent Plaintiff's

("SLD") in basic reading.  ALJ Op. at 2-3.  N.M.'s classification was based on a March 2016 psychological evaluation by Michael Gerson, a psychologist retained by Plaintiff, and a neurodevelopmental evaluation by Dr. Isabel Carotenuto  *Id.* at 3.  Gerson found that N.M. had a high average IQ of 116 and was "bright," and "intellectually capable."  *Id.*  However, Gerson also opined that N.M.'s scores in word reading, decoding, and spelling suggested a language-related learning disability.  *Id.*  The District developed and implemented an IEP for N.M. prior to her starting the sixth grade.  *Id.*

In 2017, following her annual IEP review, N.M. was found eligible for special education and related services under the classification of SLD in the areas of basic reading and math calculation skills.  *Id.* at 4.  N.M.'s IEP for the seventh grade provided for in-class resources in English, Math, Science, and Social Studies; pull-out resource replacement for learning skills; counseling services; extended time on in-class assessments and assignments; and advanced notice of, and study guides for, tests and quizzes.  *Id.*  In 2018, following N.M.'s annual IEP review, the District agreed to implement an IEP for N.M.'s eighth grade year providing for supplemental learning skills; in-class resources and learning skills; counseling services; and supplementary aids and services.  *Id.*

In April 2019, the District informed Plaintiff that it would conduct educational and psychological re-evaluations as part of N.M.'s triennial review.  *Id.*  Plaintiff consented and additionally requested a speech and language evaluation, which the District agreed to perform.  *Id.*  Plaintiff also reported that N.M. feels overwhelmed when she has multiple assignments to complete within a short time period and becomes frustrated when she is confused about

---

SOMF is unsupported or contradicted by the administrative record, the Court will rely on the record.

schoolwork. *Id.* The educational re-evaluation was conducted by Lauren McKenna, a learning disabilities teacher consultant employed by the District. *Id.* The psychological re-evaluation was conducted by Lydia MacIntosh-Haye, a District school psychologist. *Id.* at 5. The speech and language evaluation was conducted by Jennifer Schwartz, the District's speech-language specialist. *Id.*

McKenna administered various tests to measure N.M.'s performance in reading, math, written language, academic knowledge, and oral language. *Id.* N.M.'s performance in the basic reading skills cluster, which includes the letter word identification and word attack subtests, fell within the average range. *Id.* N.M.'s performance in the math calculation skills cluster, which includes the calculation and math fluency subtests, also fell within the average range. *Id.* at 5-6. McKenna found that N.M.'s scores showed linear progress, including growth in reading fluency and consistency in her math scores. *Id.* at 12. She also found that N.M. was performing commensurate to her peers and using minimal accommodations. *Id.* McKenna examined the areas that directly correspond to the SLD categories outlined in N.J.A.C. 6A:14-3.5(c)(12) and found that N.M. did not have a discrepancy warranting a SLD classification. *Id.* at 13.

As part of the psychological re-evaluation, MacIntosh-Haye administered an IQ test, on which N.M. scored 111 points. ALJ Op. at 6. Though N.M. scored five points lower on the IQ test than she did during her 2016 evaluation, both scores fell within the high-average range and there was no evidence that this five-point difference was statistically significant. *Id.* MacIntosh-Haye also determined, based on information provided by two of N.M.'s eighth grade teachers, that N.M. did not need further investigation into potential anxiety or depression. *Id.* at 7. Finally, MacIntosh-Haye determined that the concerns raised by N.M.'s parents were unremarkable with regard to N.M.'s social or emotional development or functioning. *Id.*

For the speech and language evaluation, Schwartz administered various tests indicating that N.M.'s overall speech and language skills were in the average to above-average range. *Id.* at 8. Because N.M. did not present with any speech or language deficits, Schwartz did not recommend services in this area. *Id.*

Following the evaluations, a re-evaluation eligibility determination IEP meeting was held on June 18, 2019. *Id.* Based on the results of the evaluations, the District determined that N.M. was no longer eligible for special education and related services and should be declassified. *Id.* Petitioner did not agree to the declassification. *Id.* On June 27, 2019, the District held a telephone conference with Plaintiff, explained the reasons for declassification, and offered to have the District provide a neuropsychological examination of N.M. to determine whether she could continue to receive special education under a diagnosis of ADHD. *Id.* at 8. Rather than pursue this option, Plaintiff commenced administrative proceedings.

**B. Administrative Proceedings**

On June 28, 2019, Plaintiff, through her parent advocate, filed a petition for mediation against the District. J631-34. On September 5, 2019, the case was transmitted to the Office of Administrative Law. SOMF ¶ 19; ALJ Op. at 2. On October 3, 2019, a settlement conference was held, but the parties were unable to resolve the matter. SOMF ¶ 21.

In December 2019, Plaintiff produced an educational evaluation report prepared by Amanda Hope Colannino, a learning disabilities teacher and consultant. ALJ Op. at 8, 26. Colannino's report was based on her November 23, 2019 evaluation of N.M. *Id.* at 8. Colannino found that N.M. fell in the average range in oral language, reading, mathematics, written language, and word identification and spelling. *Id.* at 8-9. Based on Colannino's testing, N.M. fell in the below average range for math fluency, certain areas of the phonological processing test, and sound-symbol knowledge. *Id.* at 9.

Plaintiff also submitted two psychiatric evaluation reports from Amy Carnall dated March 16, 2018 and November 11, 2019.  *Id.* at 9.  Based on her November 2019 evaluation, Carnall opined that N.M.'s "school-based anxiety" had escalated and diagnosed N.M. with school phobia, chronic PTSD, panic disorder, generalized anxiety disorder, and adjustment disorder.  *Id.* at 9-10.

The ALJ held a hearing in February and March 2020.  SOMF ¶¶ 21-22, ALJ Op. at 2. Plaintiff's witnesses included Gerson, Carnall, and Colannino.  *Id.* at 22-29.  The District's witnesses included McKenna; MacIntosh-Haye; Melissa Varcardiponi, a school social worker who counseled N.M. during her seventh and eighth grade years; Dr. Vincent D'Elia, who oversees the District school counselors and participated in N.M.'s IEP eligibility and annual review meetings; and several of N.M.'s eighth grade teachers.  *Id.* at 10-22.  On June 12, 2020, the parties submitted their post-hearing briefs.  SOMF ¶ 23, ALJ Op. at 2.

On July 21, 2020, the ALJ issued her final decision and order.  SOMF ¶ 24; ALJ Op.  The sole issue addressed was "whether the District's determination to declassify N.M. following her triennial review in June 2019 was appropriate."  ALJ Op. at 36.  With regard to the District's witnesses, the ALJ found that the witnesses who had conducted N.M.'s 2019 evaluations— McKenna, Schwartz, and MacIntosh-Haye—were "qualified, detailed and persuasive expert and fact witnesses," and that the witness testimony provided by the District's employees, including N.M.'s schoolteachers, was "credible and consistent with other offered evidence."  *Id.* at 33.  The ALJ further noted that the witnesses who saw N.M. on a near daily basis during her eighth grade year confirmed that N.M. is "a very social, self-motivated and bright student," who "performed very well in her classes, [] completed her homework assignments in a timely fashion," and "rarely utilized any accommodations other than those that were already offered to all students in the class." *Id.*  While the ALJ noted that Plaintiff's testimony describing N.M.'s anxiety at home was credible,

she also found that N.M.'s teachers credibly testified that she did not exhibit anxiety in the eighth

grade and concluded that these behaviors were not exhibited at school. *Id.*

With regard to Plaintiff's witnesses, the ALJ found that Colannino "presented as a

qualified, thorough, and generally persuasive witness." *Id.* at 34. However, the ALJ placed

"limited weight" on Gerson's conclusion that N.M. should continue to be classified because he

had not assessed N.M. since N.M. was in the fifth grade, three years prior to the proposed

classification, and thus his report was "not the best indicator of N.M.'s intellectual ability or

achievement in June 2019." *Id.* The ALJ further noted that Gerson had never served on N.M.'s

child study team, had not reviewed her pupil file, IEPs, progress reports or grades, and had never

observed her in an educational setting. *Id.* Accordingly, the ALJ afforded more weight to

MacIntosh-Haye's testimony as to N.M.'s intellectual ability and needs in June 2019. *Id.* Finally,

the ALJ gave "no weight" to Carnall's November 2019 report, noting that it was unreliable because

it was based "almost exclusively on unsubstantiated statements made to her by Plaintiff and N.M.

five months after [Plaintiff] filed for due process," and Carnall accepted as fact anything that

Plaintiff told her without corroborating those claims. *Id.* at 35. The ALJ also gave "little weight"

to Carnall's testimony regarding N.M.'s psychiatric state around the time of the proposed

declassification because she had only met with N.M. on one occasion 15 months prior to the

proposed declassification. *Id.*

The ALJ then found that the District had appropriately utilized a severe discrepancy

methodology using a 1.5 standard deviation between student achievement and intellectual ability

to determine whether N.M. has a SLD. *Id.* The ALJ also determined that "the District conducted

appropriate and adequate testing of N.M. in connection with her re-evaluation." *Id.* at 38-39. The

ALJ concluded that N.M. did not have a severe discrepancy in any of the eight areas identified in

N.J.A.C. 6A:14-3.5(c)(12), including basic reading skills and mathematical calculation. *Id.* at 40. The ALJ also found that the record did not establish that N.M. had dyslexia, and that even if she did, that diagnosis alone does not constitute a SLD. *Id.* Further, the ALJ found that to the extent N.M. has weaknesses in certain areas, those weaknesses did not constitute a disability that adversely impacted N.M.'s educational performance to the extent that she requires special education and related services. *Id.* at 41. In sum, the ALJ found that N.M. did not meet the three-pronged test to qualify for special education and related services and that the District's determination to declassify her was appropriate and consistent with providing a FAPE. *Id.*

### C.  Current Proceedings

On August 7, 2020, Plaintiff filed her Complaint against the District. D.E. 1. On May 20, 2021, Plaintiff filed her motion for summary judgment on the administrative record, D.E. 24, and Defendant previously filed a brief that the Court will regard as its opposition, D.E. 22. Plaintiff also submitted a responsive brief, D.E. 39.

### II.    STATUTORY FRAMEWORK

The IDEA, 20 U.S.C. § 1401 *et seq*., is designed "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). The IDEA requires states that receive federal education funding to provide every disabled child with a FAPE. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017) (citing 20 U.S.C. § 1400, *et seq.*). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Ridley Sch. Dist. v. M.R.,* 680 F.3d 260, 268–69 (3d Cir. 2012) (internal

quotation marks omitted).  While a state is not required to maximize the potential of every disabled child, it must provide more than *de minimus* progress each year.  *Endrew F*, 137 S. Ct. at 1001. Accordingly, school districts must offer an IEP that  is "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities."  *K.D. ex rel. Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018) (quoting *Ridley Sch. Dist.*, 680 F.3d at 269).

IEPs are critical.  "An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services."  *D.S. v. Bayonne Bd. of Educ.,* 602 F.3d 553, 557 (3d Cir. 2010).  It must not be a "form document."  *Endrew F.*, 137 S. Ct. at 999.  Thus, an IEP "turns on the unique circumstances of the child for whom it is created."  *Id.* at 1001.  For a child integrated into a regular classroom, an IEP is usually "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade."  *Id.* at 999 (quoting *Bd. of Ed. of Hendrick Hudson Ctr. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203-04 (1982)). And while parents often play a role in the development of an IEP, they do not have a right to compel a school district to provide a specific program or employ specific methodology in educating a student.  *See Ridley Sch. Dist.,* 680 F.3d at 269, 278.

New Jersey has enacted legislation to ensure that students with disabilities can access a FAPE as required by the IDEA.  To be eligible for special education in New Jersey, a student must satisfy three requirements: (1) the student must be found to have one or more of the enumerated disabilities; (2) the disability must adversely affect the student's educational performance; and (3) the student must be in need of special education and related services.  N.J.A.C. 6A:14-3.5(c).  The enumerated disabilities include a SLD, which exists "when a severe discrepancy is found between

the student's current achievement and intellectual ability" in eight academic areas: basic reading skills, reading comprehension, oral expression, listening comprehension, mathematical calculation, mathematical problem solving, written expression, and reading fluency.   N.J.A.C. 6A:14-3.5(c)(12).   The list of qualifying disabilities also includes "other health impairment," which is defined as follows:

> [A] disability characterized by having limited strength, vitality, or alertness, including a heightened alertness with respect to the educational environment, due to chronic or acute health problems, such as attention deficit hyperactivity disorder, a heart condition, tuberculosis, rheumatic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia, diabetes, or any other medical condition, such as Tourette Syndrome, that adversely affects a student's educational performance. A medical assessment documenting the health problem is required.

N.J.A.C. 6A:14-3.5(c)(9).

The qualifying student's IEP must be developed by an IEP team and be reviewed at least annually.  N.J.A.C. 6A:14-3.7(b), (i).  Additionally, students classified as eligible for an IEP must be reevaluated every three years, or sooner if conditions warrant or if the student's parent or teacher requests a reevaluation.  N.J.A.C. 6A:14-3.8(a).

The IDEA provides mechanisms for an aggrieved party to submit a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."   20 U.S.C. § 1415(b)(6)(A). Initially, a party may bring a complaint to challenge the adequacy of an IEP through "an administrative 'impartial due process hearing.'"  *Ridley Sch. Dist.*, 680 F.3d at 269 (quoting 20 U.S.C. § 1415(f)).  "In New Jersey, this process entails filing a complaint and request for a due process hearing with the New Jersey Department of Education ("NJDOE")."  *Estate of S.B. ex rel. Bacon v. Trenton Bd. of Educ.*, No. 17-7158, 2018 WL 3158820, at \*2 (D.N.J. June 28, 2018)

(quoting N.J.A.C. 6A:14-2.7(c)).  A party aggrieved by the outcome of the due process hearing "shall have the right to bring a civil action with respect to the complaint presented . . . in a district court of the United States, without regard to the amount in controversy." 20 U.S.C § 1415(i)(2)(A). The party challenging the administrative decision in district court "bears the burden of persuasion . . . as to each claim challenged." *Ridley Sch. Dist.,* 680 F.3d at 270.

Relatedly, Section 504 of the Rehabilitation Act "protects the rights of disabled children by prohibiting discrimination against students on the basis of disability." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).  Section 504 provides as follows:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]

29 U.S.C. § 794.  Like the IDEA, Section 504 "has child find, evaluation, and FAPE requirements." *P.P.*, 585 F.3d at 735.  Section 504, however, "defines disability more broadly than the IDEA, and thus, some students covered by Section 504 are not covered under the IDEA." *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 269 n.4 (3d Cir. 2014).

### III.    LEGAL STANDARD

Plaintiff moves for summary judgment on the administrative record.  Unless an exception applies, "exhausting the IDEA's administrative process is required in order for the statute to 'grant[ ] subject matter jurisdiction to the district court [ ].'" *Id.* at 272 (quoting *Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir.1994)); *see also* 20 U.S.C. § 1415(i)(3)(A). "Exhaustion of the IDEA's administrative process is also required in non-IDEA actions where the plaintiff seeks relief that can be obtained under the IDEA," to prevent plaintiffs from

circumventing the exhaustion requirements "by taking claims that could have been brought under the IDEA and repackaging them as claims under some other statute." *Batchelor*, 759 F.3d at 272.

The standard of review for deciding an appeal of an ALJ decision under the IDEA differs from the standard of review governing a typical summary judgment motion. *See M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345. 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003). "When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. Of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). "Under this standard, factual findings from the administrative proceedings are to be considered *prima facie* correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (internal alterations and citations omitted). Moreover, if the ALJ has heard live testimony and found the testimony of one witness to be more credible than the contradictory testimony of another witness, "that determination is due special weight." *Id.* This means that a district court must accept the ALJ's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Id.* (internal citation omitted). "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist.*, 680 F.3d at 270. "Applying these standards, the district court may make findings "based on the preponderance of the evidence and grant the relief it deems appropriate, including an award of attorney's fees, a requirement for reimbursement for a private educational placement, and a direction for the provision of a compensatory education." *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011).

## IV.   ANALYSIS

### A.  Defendant's Motion to Supplement the Administrative Record

As an initial matter, the Court denies Defendant's motion to supplement the administrative record.  Defendant seeks to supplement the record with a two-page letter dated December 19, 2019 (the "Letter") from Danielle Pantaleo, Defendant's counsel, to Ryan Clark, Plaintiff's counsel during the administrative proceedings.  *See* D.E. 38-2.  Defendant represents that the Letter is "Defendant's Response to Petitioner's Request for Mediation" which "served as a Notice of Frivolous Litigation and incorporated the District's Answer to the Petition for Due Process."  D.E. 38-1 at 1.

"The right to supplement the record is not absolute; rather, the decision to admit additional evidence is committed to the discretion of the trial court."  *M.A. v. Jersey City Bd. of Educ.*, Civ. No. 14-6667 (KM) (MAH), 2016 WL 7477760, at *7 (D.N.J. Dec. 29, 2016) (citing *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995)).  Specifically, "new evidence should be admitted if it would assist the court in ascertaining whether Congress' goal [in enacting the IDEA] has been and is being reached for the child involved."  *Id.*  Moreover, "the court need not consider evidence that is irrelevant or cumulative."  *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 (3d Cir. 2012).

The Court is not persuaded that the Letter constitutes Defendant's response to Plaintiff's petition for mediation or that it incorporates Defendant's answer to Plaintiff's petition for due process.  The Letter merely states Defendant's position that Plaintiff's due process petition is frivolous and briefly summarizes Defendant's reasoning. D.E. 38-2. More importantly, the Letter does not provide the Court with pertinent information regarding N.M.'s declassification beyond what is already contained in the administrative record.  Because the Letter offers cumulative evidence and does not assist the Court in ascertaining whether the goals of the IDEA are being

reached as to N.M., the Court declines to supplement the record with the Letter.  *See Abington Sch. Dist.*, 696 F.3d at 253; *Jersey City Bd. of Educ.*, 2016 WL 7477760, at *7.  And because the Court is denying Defendant's motion to supplement, Plaintiff's corresponding motion to strike is denied as moot.

### B.  Plaintiff's Unexhausted Arguments

Plaintiff first argues that her petition for due process should have been granted because the District did not file an answer or motion to dismiss as required by the IDEA and the New Jersey Administrative Code.  S.J. Br. at 5.  However, Plaintiff does not appear to have raised this argument in the proceedings before the ALJ.[4]  As such, this new basis for relief is unexhausted and not properly before the Court.  *See D.C. v. Mount Olive Twp. Bd. of Educ.*, Civil No. 12-5592 (KSH), 2014 WL 1293534, at *20 (D.N.J. Mar. 31, 2014) (finding that new arguments raised by the plaintiffs were not properly before the court because "[u]nder almost any exhaustion rubric—and under the principle that 'arguments asserted for the first time on appeal are deemed to be waived,' *Tri–M Group, LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011)—several of the plaintiffs' present arguments were not presented to the agency either in form or in spirit, and thus cannot fairly be deemed exhausted").

Similarly, Plaintiff now argues that the District denied N.M. a FAPE by failing to develop an appropriate IEP.  S.J. Br. at 26-30.  Plaintiff did not raise this issue before the ALJ, and thus this argument is likewise not properly before the Court.[5]

---

[4] Plaintiff does provide any record cites pointing the Court to any such argument made before the ALJ.  The Court will not "scour the…records and transcripts, without specific guidance, in order to construct specific findings of fact."  *Holland v. New Jersey Dep't of Corrections*, 246 F.3d 267, 285 (3d Cir. 2001).

[5] In fact, Plaintiff's petition for mediation states that N.M.'s IEP *was* appropriate.  Specifically, the petition states that N.M.'s IEP *previously* was not addressing her learning and literacy

**C. N.M.'s Eligibility for Special Education**

Plaintiff contends that the ALJ erred in finding that the District's determination to declassify N.M. was appropriate.  S.J. Br. at 1.

**1. Qualifying Disability**

Plaintiff argues that N.M. qualifies for special education because she has a SLD in reading and math calculation.  S.J. Br. at 8-12.  In support, Plaintiff points to several test topics where N.M. exceeded the 1.5 standard deviation threshold for determining a severe discrepancy, including word identification, sound symbol knowledge, phonological awareness, alternate phonological awareness, and math fluency.  S.J. Br. at 10; S.J. Reply at 12-13; *see also* ALJ Op. at 28.  However, none of these topics fall within the enumerated areas for which the finding of a severe discrepancy can qualify a student for a SLD.  *See* N.J.A.C. 6A:14-3.5(c)(12).  Indeed, Plaintiff's own expert, Colannino, conceded that N.M.'s scores did not show a severe discrepancy in the enumerated areas of basic reading, reading comprehension, oral expression, listening comprehension, and writing expression.  ALJ Op. at 29.  Moreover, the ALJ explicitly found that "math fluency" is not equivalent to the enumerated area of "mathematical calculation," because the "math calculation skills" test cluster includes both the math calculation and math facts fluency subtests.  *Id.* at 40.  Thus, a severe discrepancy on N.M.'s math fluency testing results does not provide an adequate basis for finding a SLD.  *Id.* at 40; S.J. Opp. at 40-41.  In sum, the record shows that N.M. does not have a severe discrepancy in any of the eight enumerated areas and thus does not qualify as having a SLD.  ALJ Op. at 39-40.

Plaintiff further argues that N.M. presents with "strong signs of dyslexia," which "weigh[s] in favor of continued programming under the heading SLD for basic reading skills."  S.J. Br. at

conditions, but "[p]rogress was finally made and *an appropriate program was in place for N.M.*" J631-32 (emphasis added).

13.  N.M., however, was not officially diagnosed with dyslexia.  ALJ Op. at 38; J1409-12.  While a psycho-educational evaluation prepared by psychologist Lisa Tomasini, who was retained by Plaintiff, stated that N.M.'s testing was consistent with indicators of dyslexia, J1411, Tomasini did not diagnose N.M. with dyslexia, J1409-12.  Moreover, Plaintiff's expert testified that Tomasini's report suggested there "*could be* a presence of dyslexia," J1412 (emphasis added), not that N.M. displayed "strong signs" of dyslexia.  Further, Plaintiff fails to cite to any authority supporting her claim that signs of dyslexia "tip[] the balance in favor of a specific learning disability in reading skills."  S.J. Br. at 12.  Thus, to the extent N.M. displays signs of dyslexia, this factor does not alter a finding that N.M. does not have a SLD.

Plaintiff also contends that, in the alternative, N.M. qualifies for special education and related services under the "other health impairment" category.  S.J. Br. at 13-14.  Specifically, Plaintiff claims that N.M. has been diagnosed with attention deficit hyperactivity disorder ("ADHD") and motoric overflow, as well as post-traumatic stress disorder, generalized anxiety disorder, social anxiety, separation anxiety, depression, adjustment disorder with academic inhibition, and social pragmatic learning disability.  *Id.*  ADHD is an explicitly enumerated health impairment that qualifies a student for special education and related services.  *See* N.J.A.C. 6A:14-3.5(c)(9).  But N.M. has not been diagnosed with ADHD; rather, Tomasini noted in her 2017 report that N.M. showed "features of an Attention Deficit/Hyperactivity Disorder."  J20.  Additionally, while one of N.M.'s teachers reported that she had "more concerns than typical for N.M. in the area of [ADHD]," she also testified that N.M.'s focus and attention were much improved by the end of eighth grade and that N.M.'s attention issues were usually because she was socializing.  ALJ Op. at 33.  These observations by a psychologist and one of N.M.'s schoolteachers do not amount to "[a] medical assessment documenting the health problem," N.J.A.C. § 6A:14-3.5(c)(9),

and thus the Court finds that N.M. does not qualify for special education on the basis of ADHD. *See J.M.*, 2020 WL 6281719, at *9 (rejecting parents' argument that the student qualified for special education on the basis of ADHD because a neuropsychologist's report did not qualify as a "medical assessment documenting the health problem," as required by New Jersey statute).

Moreover, the ALJ gave "no weight" to the report from Carnall upon which Plaintiff relies for N.M.'s diagnosis of post-traumatic stress disorder, generalized anxiety disorder, social anxiety, separation anxiety, depression, adjustment disorder with academic inhibition, and social pragmatic learning disability. S.J. Br. at 14; ALJ Op. at 35. The Court finds no reason to disturb the ALJ's findings as to Carnall's report. Thus, Plaintiff has not shown that N.M. has a health impairment that qualifies her for special education and related services.

### 2. Adverse Effects on Educational Performance

Even assuming *arguendo* that N.M. has a disability, Plaintiff must show that this impairment "adversely affect[ed] [N.M.'s] educational performance" in order to establish that N.M. qualifies for special education. N.J.A.C. § 6A:14-3.5(c). "Generally… when students' academics do not decline… that consistency is usually found to signal that their disability does not adversely affect their educational performance." *M.S. v. Randolph Bd. of Educ.*, Civil No. 18-13029 (KSH) (CLW), 2019 WL 4785742, at *9 (D.N.J. Sept. 30, 2019), *reconsideration denied*, 2020 WL 5105231 (D.N.J. Aug. 31, 2020).

Plaintiff argues that N.M.'s disabilities adversely affect her educational performance because N.M. has regressed in reading, math, and verbal ability. S.J. Br. at 15. In support, Plaintiff cites only to Colannino's cursory testimony that "N.M. regressed in math," J1392, and her testimony that N.M.'s verbal comprehension IQ fell from 118 to 108, J1385. Plaintiff does not contend that N.M.'s grades have declined or that her academic performance at school has otherwise

suffered.  To the contrary, it is undisputed that N.M. has achieved grades in the A and B range throughout middle school.  ALJ Op. at 42.  Multiple teachers who taught N.M. on a daily basis in eighth grade testified that she showed significant improvement that year; rarely used any accommodations that were not offered to all students; consistently completed her work on time; and became more independent, self-sufficient, and organized throughout middle school.  *Id.* at 40-41.  Accordingly, Plaintiff has not shown that a disability has adversely affected N.M.'s academic performance.  *See Ridley*, 680 F.3d at 272 (finding that the child did not have a disability where "although areas of weakness were found, [the child's] academic skills were generally considered to be in the average range").

Relatedly, the Court disagrees with Plaintiff that the ALJ "applied an incorrect standard when she found that because N.M. was achieving grades in the A and B range, [] she no longer required an IEP."  S.J. Br. at 18.  First, Plaintiff mischaracterizes the record.  The ALJ considered a variety of factors, in addition to N.M.'s grades, before concluding that N.M. no longer qualifies for special education.  *See* ALJ Op. at 40-41.  For instance, the ALJ considered the testimony of N.M.'s teachers regarding N.M.'s improvements and achievements; the fact that N.M. rarely used any accommodations not offered to all students and that the accommodations provided to her through her IEP would be made available in the general education setting in high school; and the testimony of Plaintiff's own expert, Colannino, that N.M. is "so smart that she has been able to use her strengths in comprehension and vocabulary to compensate for her weaknesses."  *Id.* Further, *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 567 (3d Cir. 2010) on which Plaintiff relies is inapposite.  In *Bayonne Bd. of Educ.*, the student was in classes "composed entirely of special education students," and the Third Circuit found that "high grades [] achieved in classes *with only special education students* set apart from the regular classes of a public school system, the grades

18

are of less significance than grades obtained in regular classrooms." *Id.* at 567 (emphasis added). In sum, the Court finds Plaintiff's argument regarding the ALJ's consideration of N.M.'s grades unpersuasive.

### 3.   Need for Special Education

The third requirement for finding that a student qualifies for special education is whether that student "needs special education and related services" as a result of a disability.  N.J.A.C. 6A:14-3.5(c).  One court within this District has noted that "[p]ersuasive authority instructs that a child 'needs special education' if he cannot attain educational standards in the general education environment." *J.M.*, 2020 WL 6281719, at *10.

Plaintiff argues that N.M. "requires special education to overcome her disability," and "has relied on her IEP to access her education."  S.J. Br. at 17.  The record, however, points to a different conclusion.  As discussed above, N.M. has earned grades in the A and B range and has otherwise performed well according to the testimony of her teachers.  Importantly, N.M.'s teachers testified that she rarely used any accommodations not already offered to all students.  ALJ Op. at 40-41. Moreover, McKenna, a learning disabilities teacher consultant employed by the District, testified that the accommodations provided to N.M. through her IEP would be made available to her in the general education setting at N.M.'s high school.  *Id.* at 41.  Thus, the Court finds that N.M. does not need special education and related services.

Because Plaintiff has not satisfied the three requirements demonstrating that N.M. qualifies for special education, the Court finds that the District's determination to declassify N.M. and exit her from special education was appropriate.

### D.   Adequacy of N.M.'s Evaluations

Plaintiff additionally argues that the District denied N.M. a FAPE by failing to evaluate her for all areas of suspected disability.  S.J. Br. at 24-26.  According to Plaintiff, Colannino

"demonstrated that the District's evaluations did not capture the true extent of N.M.'s disabilities." *Id.* at 25. Specifically, Plaintiff claims that the District did not administer the oral language portion of the Woodcock Johnson evaluation. S.J. Br. at 25. This claim is belied by the record and the testimony of Plaintiff's own expert, Colannino, who testified that the District failed to administer *one section* of the oral language portion: phonetic coding. J1381. And Colannino testified that it would be inappropriate to eliminate the phonological testing section "if…the child was previously categorized as dyslexic[.]" J1382. But as discussed above, N.M. was never diagnosed with dyslexia. Further, when N.M. took the phonetic coding test two years earlier, her test results did not show a severe discrepancy. ALJ Op. at 39.

Plaintiff also contends that "the ALJ ignored evidence of a possible disability," namely N.M.'s possible dyslexia. S.J. Br. at 26. The Court disagrees. The ALJ explicitly discussed the evidence regarding N.M.'s potential dyslexia and noted that there was no official diagnosis of dyslexia and that no expert testified that N.M. is dyslexic based on the results of her testing in the area of phonological awareness. ALJ Op. at 38. The ALJ therefore found that the record did not establish that N.M. has dyslexia. *Id.* Plaintiff's argument that the District should have tested for areas of phonological deficits "[b]ecause N.M. had a history of dyslexia" is unpersuasive. S.J. Br. at 25.

Moreover, the ALJ considered additional evidence and testimony in finding that the District conducted adequate testing. For instance, the ALJ noted that N.M. performed in the average range in the basic reading skills cluster and was performing well in her language arts and other classes without any teacher concerns regarding her ability to read. ALJ Op. at 39. The ALJ also pointed to testimony from one of Plaintiff's experts, Colannino, conceding that the Woodcock Johnson test administered by McKenna is accepted as an industry standard and testimony from

another, Gerson, conceding that the District's testing was through and reasonably done.  *Id.*  In sum, the ALJ's finding that the District conducted appropriate and adequate testing of N.M. is supported by the record, and the ALJ did not err in so finding.

### E.  Rehabilitation Act

To bring a discrimination claim under Section 504 of the Rehabilitation Act, a plaintiff must show "that (1) he or she is 'disabled' under the act, (2) he or she is 'otherwise qualified' to participate in school activities, (3) the defendant receives federal financial assistance, and (4) he or she 'was excluded from participation in, denied the benefits of, or subject to discrimination at, the school.'"  *New Jersey Prot. & Advocacy, Inc. v. New Jersey Dep't of Educ.*, 563 F. Supp. 2d 474, 491 (D.N.J. 2008) (quoting *Andrew M. v. Del. County Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007)).  Critically, "[a] plaintiff cannot make out a [Rehabilitation Act] claim simply by proving (1) that he was denied some service and (2) he is disabled.  The state must have failed to provide the service *for the sole reason that the child is disabled*."  *Andrew M.*, 490 F.3d at 350 (emphasis added).

Plaintiff argues that she has made a *prima facie* case under Section 504 of the Rehabilitation Act.  S.J. Br. at 23.  Plaintiff's claim of disability discrimination under the Rehabilitation Act is indistinguishable from her IDEA claim.  Because the Court finds that Plaintiff's IDEA claims fail, her Rehabilitation Act claim does as well.  *See Downingtown Area Sch. Dist.*, 904 F.3d at 254 ("[T]hough [plaintiff's] parents claim disability discrimination under the ADA and Rehabilitation Act, their theory is indistinguishable from their IDEA claim.  So all three claims fail together.").[6]

---

[6] Even if the Court considers Plaintiff's Rehabilitation Act claim on the merits, Plaintiff fails to provide cites to the administrative record showing that the four requirements to bring a discrimination claim under the Rehabilitation Act have been met or that N.M. was denied a service for the sole reason that she is disabled.

### F.   Stay-Put Mandate

Plaintiff next argues that the District denied N.M. a FAPE by failing to fully implement N.M.'s stay-put IEP at the start of the 2020-2021 school year, after Plaintiff filed the instant action.[7]  S.J. Br. at 31-33.  The "stay-put" provision of the IDEA requires that, "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child."  20 U.S.C. § 1415(j).  "This rule is protective in nature and reflects Congress's policy choice that all children with disabilities remain in their current educational placement until the dispute about their placement is resolved, 'regardless of whether their case is meritorious or not.'"  *Hatikvah Int'l Acad. Charter Sch. v. E. Brunswick Twp. Bd. of Educ.*, 10 F.4th 215, 218–19 (3d Cir. 2021) (quoting *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 83 (3d Cir. 1996)).

Plaintiff contends that the District failed to fully implement the stay-put IEP because it did not provide counseling and supplemental services, including after-school supplementing tutoring, from the first day of school in September 2020 until around November 2, 2020.  S.J. Br. at 33; D.E. 24-5.  Defendant does not contest this statement.  Plaintiff concedes, however, that the District subsequently implemented the IEP.  S.J. Br. at 33.  Thus, the only issue is whether the District "now owes [N.M.] additional compensatory education" for the period during which the District failed to provide counseling and supplemental services to N.M. as required by her IEP.  *Id.* at 32.

From the information that Plaintiff herself submitted, it appears that the District already offered to make up for the services missed during the five weeks that the services were not

---

[7] As this alleged violation arose after the ALJ's opinion was issued, Plaintiff necessarily did not raise this issue during the administrative proceedings.  However, "there is no exhaustion requirement for actions seeking relief under the IDEA's 'stay put' provision." *M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 230 (3d Cir. 2017) (internal citation omitted).

provided to N.M.  *See* D.E. 24-5.  Plaintiff responded to the District's offer: "Thank you for acknowledging the stay-put of the IEP and the make[-]up of those missing sessions."  *Id.*  Thus, it appears that N.M. may have already received the requested relief.  In any case, based upon the documents submitted to the Court, a "compensatory education award would still be erroneous since there is simply no indication of any gross or prolonged deprivation by the district."  *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 537 (3d Cir. 1995), *as amended* (Oct. 24, 1995).  Thus, the Court does not grant compensatory relief for the five weeks during which the stay-put provision was not observed.

### G.  Compensatory Education

Finally, Plaintiff seeks compensatory education for N.M. as an equitable remedy for the District's alleged denial of a FAPE.  S.J. Br. at 33-39.  "If an individual was deprived of his or her right to an adequate FAPE, and by extension an IEP, prior to the age of twenty-one, it follows that the student could only be fully compensated by an award of compensatory education that contains the elements of a FAPE that she was previously denied."  *Ferren C. v. Sch. Dist. of Philadelphia*, 612 F.3d 712, 717 (3d Cir. 2010).  Here, because the Court finds that N.M. was not denied a FAPE, compensatory education is not appropriate.

### V.    CONCLUSION

For the foregoing reasons, the parties' motions, D.E. 24, D.E. 38, and D.E. 42, are **DENIED**.  An appropriate Order accompanies this Opinion.

Dated: December 9, 2021

John Michael Vazquez, U.S.D.J.